**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

JEFFREY CHARLTON,

                              Plaintiff,

        v.                                                      No. 08-CV-142
                                                                    (DRH)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

─────────────────────────────────

**APPEARANCES:**                          **OF COUNSEL:**

MARK A. SCHNEIDER, ESQ.
Attorney for Plaintiff
57 Court Street
Plattsburgh, New York 12901

HON. ANDREW T. BAXTER                  SHEENA V. WILLIAMS-BARR, ESQ.
United States Attorney for the         Special Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER

        Plaintiff Jeffrey Charlton ("Charlton") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for benefits under the Social Security Act.

Charlton moves for a finding of disability and the Commissioner cross-moves for a

judgment on the pleadings.  Docket Nos. 10, 12.  For the reasons which follow, it is

recommended that the Commissioner's decision be affirmed.

## I. Procedural History

On January 31, 2005, Charlton filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. T. 40-44.[1]  That application was denied on August 2, 2005.  T. 22.  Charlton requested a hearing before an administrative law judge ("ALJ") and a hearing was held before ALJ Elizabeth Koennecke on July 5, 2007 via video conference.  T. 25-26, 218-49.  In a decision dated September 21, 2007, the ALJ held that Charlton was not entitled to disability benefits.  T. 11-20.  On November 5, 2007, Charlton filed a timely request for review with the Appeals Council.  T. 7-9.  On January 4, 2008, the Appeals Council denied Charlton's request, thus making the ALJ's findings the final decision of the Commissioner.  T. 4-9.  This action followed.

## II. Contentions

Charlton contends that the ALJ erred in (1) finding that his obesity, was not of sufficient severity to constitute a listed condition, (2) not considering properly the medical opinions and other evidence of record, (3) finding that Charlton was not credible concerning his statements of pain and disability, (4) concluding that Charlton retained sufficient residual functional capacity (RFC) to perform work, and (5) stating that a vocational expert was not required to determine whether Charlton retained the residual functional capacity (RFC) to continue working.

---

[1]"T." followed by a number refers to the page of the administrative record. Docket No. 7.

2

### III. Facts

Charlton is currently forty-six years old and completed high school, a Pinkerton Security Guard training course, and the correctional officers academy.  T. 60, 224-25. Charlton's previous work experience included assembly work,  field supervisor for the Salvation Army, gas station attendant, publications distributor, test administrator for federal airport security, custodian, security guard, hardware department associate, taxicab operator, doorman, and chauffeur.  T. 56-57, 62, 225-27.  Charlton alleges that he became disabled on October 15, 2002 due to musculoskeletal complaints, morbid obesity,[2] asthma, and depression.  T. 16.

### IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical

_____

[2]Charlton is 5'11" tall and weighs 390-400 pounds.  T. 55, 230.

3

and laboratory diagnostic techniques." Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. -4 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

4

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

**V.  Discussion**

**A. Medical Evidence**

**1. Work History**

Charlton has not engaged in any substantial gainful activity since the onset of

5

disability on October 15, 2002.  T. 16.

## 2. Knee and Ankle Pain

On June 9, 2002, Charlton received treatment from Dr. Shah for bilateral leg swelling and right knee pain.  T. 211.  On August 27, 2002, Charlton returned with complaints of left knee pain which had persisted for several months.  T. 149. Examination showed tenderness over the knee joint, x-rays were unremarkable, and Dr. Shah diagnosed Charlton with a possible medial meniscus tear.  Id. at 149, 154. On September 21, 2002, Charlton underwent an MRI of his left knee which showed that his anterior and posterior cruciate ligaments were intact, a definite meniscal tear could not be identified, and fluid had built up in the knee confirming a possible injury. T. 152.  The impression was that further arthroscopy and therapeutic evaluations should be conducted.  Id.

On October 1, 2002, Charlton was seen by orthopaedist Dr. Stewart for his continued left knee pain.  T. 148.  Dr. Stewart indicated that the MRI was inconclusive but that Charlton still suffered from pain, especially when walking and pivoting, which was consistent with a torn meniscus.  Id.  Dr. Stewart discussed surgery with Charlton and suggested he undergo a knee arthroscopy.  Id.  On October 17, 2002, Charlton signed the surgical consent forms, and underwent a physical examination which showed that, other than obesity and his injured left knee, his health was normal.  T. 148.

On October 21, 2002, Charlton underwent another preoperative examination at

Massena Memorial Hospital before his knee surgery.  T. 86-92.  The examination indicated that (1) he was obese, (2) he had normal vital signs, and (3) his chest x-ray showed scarring in his lungs but he was asymptomatic.  T. 87-89, 92.  The surgery was scheduled for November 6, 2002.  T. 94, 148.  On April 3, 2003, Charlton returned to the orthopaedic group seeing Dr. Bakirtzian for complaints of on-going left knee pain.  T. 146.  By then, Charlton had been scheduled for knee surgery three times and had cancelled all three but now wished to undergo surgery.  Id.  Charlton still experienced pain in his knee and was informed that he would be scheduled for surgery a final time, but that if he cancelled again, he would be required to seek treatment from a different orthopaedic group.  Id.  Twelve days later, Charlton's wife cancelled the surgery due to a family member's illness.  Id.

On June 6, 2003, Charlton returned to Dr. Bakirtzian on a referral from Dr. Gupta at Massena Memorial.  T. 146.  On July 1, 2003, Charlton underwent a preoperative consultation at the hospital, subjectively stating that he generally felt good, had aches and pains and some numbness and tingling in extremities, exhibited good range of motion in his knee, and showed no signs of clubbing or swelling.  T. 125; see generally T. 124-32.  Surgery revealed no lateral meniscal tears but a "very small tear" in the medial compartment which was successfully debrided.  T. 128.

On July 15, 2003, Dr. Bakirtzian found that Charlton was doing well, previous pain had dissipated, he had good quadricep strength, the knee had full mobility, and Charlton was finishing his therapy that week.  T. 144.  Ten days later, Charlton returned to the orthopaedist seeing Dr. Stewart complaining of left knee and right ankle pain.  T. 144.  Dr. Stewart noted full range of motion and strength in the left knee with

7

no signs of significant pain and slight ankle pain which was improving.  Dr. Stewart recommended that Charlton continue to increase his work and activities culminating in exercising for a mile.  Id.  On August 20, 2003, Dr. Stewart again found full range of motion in both the ankle and knee, full strength in the knee, and mild to moderate tenderness of the knee and ankle upon palpation.  Id.  Dr. Stewart recommended physical therapy for the right ankle and left knee.  Id.

A month later, Charlton returned for a follow-up appointment for a right ankle sprain.  T. 142.  Physical examination showed improved range of motion, the ability to walk with a nonantalgic gait,[3] and intact sensation.  Id.  Dr. Stewart recommended continued physical therapy as it seemed to be helping.  Id.  On October 3, 2003, Dr. Stewart found full range of motion in his ankle, tenderness over the tendons, and unremarkable x-rays, and recommended continued physical therapy.  T. 142.  Charlton did not attend his next appointment.  Id.  On October 31, 2003, Dr. Stewart found that physical therapy was improving the status of his knee and foot and Charlton was advised to continue with it.  Id.  A month and a half later, Charlton again failed to attend his scheduled appointment.  T. 141.

On April 6, 2004, Charlton underwent x-rays of his right foot at Massena Memorial Hospital.  T. 181.  The x-rays showed no indication of fracture or dislocation, the joint spaces were well preserved, there were no abnormalities, but there was a subchondral defect in the ankle possibly associated with a loose body.  Id.  Charlton

---

[3] An antalgic gait is a "posture or gait assumed so as to lessen pain."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 90 (28th ed. 1994) [hereinafter "DORLAND'S"].

was diagnosed with an osteochondral defect[4] of his ankle.  Id.  On April 17, 2004, Charlton underwent an MRI of his right foot and ankle which confirmed the existence of an osteochondral defect, discovered no fragments in the joint space, the structures surrounding the ankle appeared intact, and there were no masses or swelling.  T. 180. The impression was that the defect was the result of a stage III lesion.  Id.  On April 30, 2004, Charlton returned to Dr. Stewart complaining of ankle pain.  T. 141.  Charlton had attempted weight reduction programs but was still experiencing pain.  Id.  The physical examination showed slight pain but full range of motion and strength in the ankle.  Id.  Dr. Stewart advised further examination by an orthopaedist in Syracuse.  Id.

Charlton did not seek additional treatment for his ankle or knees until February 3, 2005 when he was seen by his primary care physician, Dr. Gupta, complaining of right ankle pain, arthritis in both knees, and back pain.  T. 178.  Physical examination showed no swelling in the extremities but pain in the right ankle, both knees, and his lower back.  Id.  Charlton was diagnosed with degenerative joint disease of the knee and other joints, ankle and low back pain, asthma, and obesity.  Id.  Dr. Gupta again advised Charlton to see the orthopaedist in Syracuse or return to Dr. Stewart.  T. 179.[5] On March 22, 2005, Charlton saw Dr. Gupta again, complaining that his ankle had continued to bother him, he was still financially unable to travel to Syracuse, and he was hesitant to see the Syracuse orthopaedist.  T. 175.  Charlton's physical

---

[4] Osteochondral defects are "localised areas of joint damage," of varying severity that often result in symptoms of pain and instability of the joint.  See <http://www thefootand ankleclinic.com/osteochondral-defects.htm> (visited Mar. 20, 2009).

[5] Charlton informed Dr. Gupta that financial constraints had prevented him from traveling to and seeking evaluation from a specialist in Syracuse.  T. 148.

examination was unremarkable and he was again diagnosed with degenerative joint disease at multiple sites and encouraged to seek treatment in Syracuse.  Id.  Charlton was seen again in April and June, with identical results.  T. 173-74.

### 3. Arm and Elbow

On November 25, 2002, Charlton went to the Massena Memorial Emergency Room ("ER") for left arm pain.  T. 96-106.  Charlton had been seeing Dr. Stewart for left tennis elbow,[6] but Dr. Stewart was unavailable.  T. 97-98.  Charlton had full range of motion in his arm and occasional tingling in his hand, a splint was applied, his pain lessened, and he was discharged from the ER.  T. 98, 101, 106.  An x-ray showed normal alignment and position of the bones and no evidence of swelling or other abnormalities.  T. 103.

On December 2, 2002, Charlton saw Dr. Bakirtzian for a follow-up of his elbow pain.  T. 147.  When he raised his arm, he experienced pain and that he had neither tried physical therapy nor a brace.  Id.  Charlton had a full range of motion and strength in his elbow, was diagnosed with tennis elbow, and was recommended to begin physical therapy.  Id.  On December 30, 2002, Charlton was seen by Dr. Stewart complaining of continued, yet improving, symptoms.  T. 147.  Therapy were working, he had full range of motion in his elbow, there was tenderness, his sensation was

_____

[6] Tennis elbow, scientifically known as lateral epicondylitis, "is one of several overuse injuries that can affect [the] elbow," resulting in tendon pain from the point where the "forearm muscles attach to the bony prominence on the outside of [the] elbow." <http://www.mayoclinic.com/health/tennis-elbow/DS00469> (visited Mar. 20, 2009).  The resulting pain is generally treated with rest and over-the-counter pain medication.  Id.

intact, and he was recommended to continue physical therapy.  Id.  Charlton had no further complaints of left arm and elbow pain.

On May 30, 2003, Charlton returned to the ER with complaints of right arm pain and transient numbness.  T. 116-23.  Charlton was given a sling and pain relievers and again diagnosed with tennis elbow.  T. 119, 123.  Two weeks later, Charlton received radiology results from Massena Memorial for his right elbow which showed a small ossific fragment.  T. 185.  In September 2003, Charlton was seen by Dr. Stewart complaining of right elbow pain similar to his previously diagnosed left tennis elbow.  T. 143.  Physical examination showed full range of motion, point tenderness, and pain with a resisted extension of his wrist.  Id.  Dr. Stewart provided Charlton with a brace and recommended physical therapy.  Id.  Charlton was next seen on October 31, 2003 complaining of right wrist and elbow pain.  T. 142.  Physical examination again showed full range of motion and strength, with mild tenderness over part of his wrist.  Id. Continuation of physical therapy was recommended.  Id.

### 4. Back

On December 8, 2002, Charlton went to the ER with pain between his shoulder blades which had persisted for at least a day.  T. 107-15.  Charlton was ambulatory upon arriving in the ER and could not remember any trauma or recent injuries, but reported a history of neck and back pain aggravated by sitting and relieved by remaining still.  T. 111.  Charlton was in mild distress, suffering from muscle spasms and acute chronic pain in his upper back, and diagnosed with a strain.  T. 112.  The radiology results showed normal alignment, no signs of fractures, well preserved disc

11

spaces with small osteophytes, and an overall mild degenerative change without fracture.  T. 113.  Charlton was discharged with a referral and orders to rest and heat his back and take pain relievers.  T. 115.

Charlton was not specifically evaluated again for his back until February 3, 2005.  T. 178-79.  Dr. Gupta concluded that Charlton had lower back pain and degenerative joint disease.  T. 178.  Charlton was advised to lose weight.  Id.  Charlton visited the ER again on February 6, 2005 complaining of back pain.  T. 164-71. Charlton reported that he had experienced pain for approximately one month, he was not regulating his pain with medication, and the quality and severity of his pain was moderate.  T. 168.  Physical examination showed that Charlton was in mild distress with a decreased range of motion in his back, muscle spasms, and point tenderness to palpation, and he was diagnosed with an acute back strain.  T.169.  Charlton was given pain medication and discharged the same day, with no ambulatory assistive devices, in an improved condition.  T. 166, 169, 171.

Charlton was examined by Dr. Gupta on March 8 and 22, April 29, and June 8, 2005.  T. 173-76.  At each, Charlton made generalized complaints of joint and back pain, the physical examinations were unremarkable, weight loss was recommended, and he was diagnosed with inter alia degenerative joint disease.  Id.

### 5. Obesity

Charlton has been struggling with obesity throughout the duration of his disability claims.  T. 229-30.  Obesity was first cited as a complicating co-morbidity on October 17, 2002, and was a concern which was consistently voiced in conversations

concerning Charlton's left knee surgery.  T. 88, 148.  On February 17, 2005, Charlton began a prescription weight loss program.  T. 177.  His starting weight was approximately 390 pounds.  Id.  On March 8, 2005, Charlton returned to Dr. Gupta requesting more prescriptions for weight loss medication which he was tolerating well.  T. 176.  As discussed above, Charlton's physical examination was unremarkable except for his morbid obesity and degenerative joint disease.  Id.

On March 22, 2005, Charlton reported that he had lost eleven pounds and required another weight loss drug prescription.  T. 175.  Charlton's physical examination remained unchanged.  Id.  On April 29, 2005, weight gain was noted as was the fact that Charlton was not refilling his prescription medications.  Id.  Overall, Charlton had lost little weight on the medication and his physical examination remained relatively unchanged.  Id.  By May 8, 2007, when Charlton began seeing Dr. Shah for treatment, his weight had increased to approximately 401 pounds.  T. 208.

### 6. Respiratory and Abdominal Ailments

On July 16, 2003, Charlton underwent a CT scan of his abdomen at Massena Memorial which was compared with a CT scan from September 2002 and revealed a potential fatty infiltration, a small calcific density in the right kidney, and an unremarkable spleen, pancreas, adrenal glands, and gallbladder.  T. 183-84.  The overall impression was that, like the earlier one, the scan was unremarkable.  T. 184.  Charlton was next seen at Massena Memorial for an ultrasound of his abdomen on April 6, 2004 where fatty infiltration was seen in the liver, but his overall condition was unchanged.  T. 182.

13

On August 14, 2004, Charlton went to the ER complaining of inter alia an upper respiratory infection, asthma, and pneumonia. T. 157. Charlton was discharged the same day with an inhaler and a prescription for his infection. T 163. During two of his appointments with Dr. Gupa in February 2005, Charlton's respiratory conditions were listed as ailments from which he was continually suffering, but there was no indication that these conditions were aggravated, uncontrolled, or uncomfortable. T. 177-79.

On March 22, 2005, Charlton returned to Dr. Gupta complaining of sinus congestion and the need for more allergy prescriptions. T. 176. The assessment showed that Charlton had sinusitis and was to continue with his gastroesophageal reflux disease ("GERD")[7] medication. Id. A few weeks later, it was found that Charlton permanently suffered from chronic sinusitis, GERD, and asthma. T. 173-75. It appears that these ailments were under control with medications. On June 8, 2005, Dr. Gupta saw Charlton after a recent trip to the ER for his asthma. T. 173. Charlton had been given an inhaler and had borrowed a nebulizer from his brother. Id. Charlton's symptoms were beginning to return. Id. Charlton was directed to use the nebulizer and prescription medication regularly. Id. In May 2007, Charlton began complaining of abdominal pain again. T. 209-11. He was seen three times, it was determined through another CT scan and x-ray that he had a small left kidney stone and his right kidney was normal, he had mild signoid diverticulosis[8] but no signs of active

---

[7] GERD is persistent acid reflux which "occurs more than twice a week . . . ." <http://digestive.niddk.nih.gov/ddiseases/pubs/gerd> (visited Mar. 20, 2009).

[8] Diverticulosis is "the presence of [circumscribed pouches or sacs in the mucus lining of the digestive system] . . . in the absence of inflammation." DORLAND'S 499-500.

14

diverticulitis,[9] and there was no acute disease identifiable in his chest or abdomen.  Id.

### 7. Disability Evaluations and Charlton's Testimony

On February 22, 2005, a disability report was filed based in part on an interviewing Charlton by video conference.  T. 52.  Charlton weighed 390 pounds and complained of a bad back, problems with his right leg and foot, and obesity which limited his mobility and endurance.  T. 55-56.  The pain and co-morbidities caused him to stop working on October 15, 2002.  T. 56.

On June 15, 2005, Charlton was examined by New York State Consultative Examiner Dr. Shara Peets.  T. 199-200.  Documented complaints included back pain , asthma, and degenerative disease involving ankles and feet.  T. 199.  Dr. Peets discussed Charlton's medical records which included (1) an x-ray of his thoracic spine on December 8, 2002 showing mild degenerative changes, (2) an x-ray of his right foot and ankle on April 17, 2004 showing an osteochondral defect, (3) a history of musculoskeletal complaints probably linked to his obesity, and (4) an MRI of his lumbar spine on June 15, 2005 showing moderate degenerative disc disease at L5-S1 with diminished disc height but no spondylolysis[10] or spondylolisthesis.[11]  T. 199-200; see also T. 201.  Physical examination showed that Charlton's gait and heel-and-toe

---

[9] Diverticulitis is an "inflammation of [the circumscribed pouches or sacs in the mucus lining of the digestive system] . . . which may undergo perforation with abscess formation."  DORLAND'S  499.

[10] Spondylolysis is the "dissolution of a vertebra . . . ."  DORLAND'S 1563.

[11] Spondylolisthesis is the "forward displacement of one vertebra over another . . . ."  DORLAND'S 1563.

standing were normal, he could execute half a squat which was limited by ankle pain, he could climb on and off the examination table without assistance, and his spine exhibited full range of motion.  T. 199.

On July 12, 2005, Charlton completed the New York State Office of Disability forms.  T. 66-76.  Charlton reported that he lived in a home with his family and on an average day he would awaken, feed and attend to his children, and perform general housekeeping while his wife worked.  T. 66-67.  Charlton reported that he could not stand in one position for any length of time or stoop repetitively and complained that his general physical endurance was not optimal.  T. 67.  Charlton also stated that despite his level of pain, he did not need assistance with his personal care or activities of daily living, including preparing meals, indoor cleaning, laundry, household repairs, ironing, and mowing.  T. 68-69.  Charlton could go out by himself, possessed a driver's license, drove his car, and shopped.  T. 70.  His hobbies included listening to music and reading and, while sometimes preoccupied with pain which lessened his resolve to participate in these activities, he had yet to abandon them completely.  Id.  Additionally, he spent time sitting, talking, watching television, and interacting with his children.  T. 71.  Charlton did not go out often due to his level of pain, periodically used crutches for ankle pain, could walk one to two blocks prior to having to rest for five to ten minutes, and occasionally needed to recline to alleviate his back pain.  T. 71-76.

Less than a month later, Charlton underwent a physical RFC assessment with disability administrator J. Klaeysen.  T. 202-07.  Charlton's diagnosis was primarily obesity with other impairments including the osteochondral defect in his right ankle and degenerative joint disease.  T. 202.  Charlton was given exertional limitations of

occasionally lifting no more than twenty pounds, frequently lifting no more than ten pounds, standing, walking, and sitting for a total of six hours in an eight-hour workday, and occasionally climbing, balancing, stooping, kneeling, crouching, and crawling.  T. 203-04.  Additionally, his history of asthma indicated that Charlton should avoid even moderate exposure to fumes, odors, dusts, gases, or areas of poor ventilation.  T. 205.

Charlton's statements that he was limited due to intense pain and his weight were deemed vague but not inconsistent with the RFC assessment since he was limited to walking only a few blocks and occasionally using crutches, but Charlton still retained full motor strength and range of motion throughout his body and use of crutches was never indicated on any of Charlton's discharge plans.  T. 206.  Besides this information, Klaeysen based his decision on Dr Peets' 2005 opinions which (1) limited Charlton to lifting and carrying fifty pounds due to his back and ankle pain, a standard less restrictive than the present assessment; (2) prohibited prolonged sitting due to back pain; and (3) limited walking to four-to-five blocks due to back pain in spite of Charlton's full ranges of motion and strength.  Id.

Charlton testified at the administrative hearing before ALJ Koennecke.  T. 218-49.  Charlton's main lower back treatments had consisted of going to the ER as he had never received therapy for his back although he took muscle relaxants.  T. 228.  Charlton had not recently been treated for his ankle pain but had discussed it with his primary care physicians.  T. 229.  Additionally, Charlton emphasized that he did not make appointments in Syracuse with the referred orthopaedist due to financial difficulties.  T. 229.  Charlton had also discussed his left knee pain, ankle, and foot problems with his primary care physician but had not received any further treatment or

diagnostic tests for his complaints of pain and believed that a primary cause of his pain was likely his obesity.  T. 231.  Charlton had asthma for which he had been treated at the ER.  T. 232.

Charlton had difficulty walking distances and could only walk one to two blocks before requiring a break, generally felt tired and lethargic as walking up and down the stairs to retrieve the laundry tired him, and had difficulty standing for long periods of time such as when he was doing the dishes.  T. 233.  Charlton periodically cooked, acted as the primary housekeeper doing laundry and vacuuming, helped with other household chores like mowing, shoveling snow for five minutes at a time, and carrying a fifty pound bag of potatoes from the car ten to fifteen feet to the house.  T. 233-34, 240-41.  Additionally, Charlton cared for his two children, then ages five and three, and was awaiting the birth of his third child.  T. 242.  This included dressing and feeding the children, and doing light housekeeping for the remainder of the day.  T. 242.  Charlton could drive but had not done so recently for reasons unrelated to his health.  T. 242.

Charlton had to change position after sitting for twenty to thirty minutes, had difficulty sleeping due to his joint and back pain, became emotional when depressed about the state of his life, had seen no improvement in his health, and was upset that he could no longer engage in his former activities since he did not have the stamina. T. 234-37, 240-41.  Charlton had not received any counseling or mental health treatment for his self-diagnosed depression.  T. 241-42.

Charlton's last job required him to sit while people took examinations and to walk around the room to ensure people were not cheating.  T. 244. Charlton reported few problems with the standing and walking requirements of the job.  Id.  Charlton also

18

stated that he was heavy at the time of the job and had back pain.  T. 245.

## B. Severity

Charlton contends that the ALJ failed properly to assess the severity of his conditions, particularly his obesity.  As noted, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities.  See subsection IV(A) supra; 20 C.F.R. § 404.1521(a) (2003).  Where a claimant alleges multiple impairments, a court will consider "the combined effect of all [] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  Id. § 404.1523.  An impairment, or combination thereof, is not severe if it does not impinge on one's "abilities and aptitudes necessary to do most jobs."  Id. § 404.1521.  Basic work activities which are relevant for evaluating the severity of a physical impairment include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. . . ."  Id. § 404.1521(b)(1).

"The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability."  DeChirico, 134 F.3d at 1180; see also 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P. App. 1 (2003)(listing of per se disabling ailments).  Additionally, the regulations state that "if an individual has an impairment that is 'equal to' a listed impairment," that individual is disabled regardless of his or her age, education, or work experience.

DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

Charlton contends that the ALJ did not properly classify and consider his obesity claims.  "Obesity is not in and of itself a disability; [h]owever, [it] may be considered severe -- and thus medically equal to a listed disability – if alone or in combination with another medically determinable . . . impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."  Cruz v. Barnhart, No. 04-CV-9011 (GWG), 2006 WL 1228581, at *10 (S.D.N.Y. May 8, 2006) (citing Soc. Sec. Rul. ("SSR") 02-1p, 67 Fed.Reg. 57859 (Sept. 12, 2002)) (internal quotations omitted); see also 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00 (Q) (instructing adjudicators to assess carefully the combined effects of obesity and musculoskeletal ailments during Steps 2 and 4 because "[o]besity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system . . . The combined effects of obesity with musculoskeletal impairments can be greater than the effect of each . . . considered separately.").

Charlton's contentions that the ALJ did not utilize his obesity during the prior determination is without merit.  The ALJ (1) continually referenced medical notes and physician opinions which pointed to obesity as a compounding factor, (2) concluded that Charlton's obesity was severe, and (3) stated that decreases in mobility and endurance would be attributable to such an ailment.  T. 16-17.  Thus, the ALJ properly consider Charlton's obesity and considered it as a factor in the severity determinations. However, as discussed infra, Charlton failed to prove that his ailments, alone or in combination, were sufficiently significant to preclude him entirely from any type of gainful employment.

20

Accordingly, the Commissioner's decision on this ground us affirmed.

### C. Treating Physician Rule

Charlton next contends that the ALJ improperly credited the opinions of the state examiners and did not request information from his treating physician to fill the gaps in the record.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the

opinion is, the less weight it will be given.  <u>Snell v. Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner.  <u>Id.</u> at 133-34; <u>see</u> 20 C.F.R. § 404.1527(e) (2005).

In this case, the ALJ discussed the state disability analyst's opinion but gave it little weight, relying more heavily on the assessments of the state consultative examiner.  T. 17-18; <u>see also</u> <u>Hopper v. Comm'r of Soc. Sec.</u>, No. 06-CV-38 (LEK/DRH), 2008 WL 724228, at *10 (N.D.N.Y. Mar, 17, 2008) ("[A] disability analyst is not considered to be an acceptable medical source under the Regulations.").  While a treating source's opinion is generally given deference, neither Dr. Gupta nor Dr. Shah, Charlton's treating sources, offered any opinions specifically addressing exertional limitations. However, after a physical examination which revealed that Charlton was limited in squatting due to ankle pain, walked normally, climbed on and off the examination table without assistance, had normal straight-leg raises, ranges of motion, reflexes and sensation in his back, suffered no muscle atrophy, and had moderate degenerative changes in the spine, Dr. Peets offered specific exertional limitations.  T. 17, 199-200.  These examination findings were consistent with the litany of radiology results, diagnostic tests, and medical findings fpr Charlton in he previous three years. Specifically, Charlton's three abdomen CT scans were unremarkable.  T. 183-84, 209-10.  Radiology results of his right foot and ankle, despite the osteochondral defect, were relatively normal with no loose fragments, abnormal structures or abnormal swelling.  T. 180-81.Radiology reports for his back showed only moderate degenerative changes which had not resulted in either spondylolysis or spondylolisthesis.  T. 113, 200-01.. After his knee surgery, Charlton did not complain

22

about pain in his left knee until recently and his bouts with asthma and GERD appeared limited and immediately and effectively treated with medication.  Thus, Dr. Peets' conclusions are substantially supported by the medical record.

To the extent that Charlton relies on any opinions from Dr. Gupta or Dr. Shah, these opinions are not in disagreement with the ALJ's findings.[12]  While the treating physicians outlined Charlton's various subjective ailments and complaints, the objective medical evidence showed Charlton's conditions to be benign and unremarkable and the most extensively discussed treatment being the weight loss prescription.  T. 173-78, 208, 211.  Additionally, Charlton's concerns of joint pains were vaguely discussed with his primary care providers, but no further treatment or diagnostic tests were ordered or apparently indicated.  T. 229-31.

Additionally, Charlton appears to contend that there was a gap in the record which the ALJ was responsible for filling since there was no conclusive proof from any treating physician that Charlton could not do sedentary work.  While an ALJ has a duty to develop the record, Hopper, 2008 WL 724228, at *11, a plaintiff has the burden to

---

[12] While Charlton was only seen by the consultative examiner once, his treatment relationship with his primary care physicians was also limited.  He saw Dr. Gupta six times in four months during 2005, primarily for successive weight loss prescriptions.  T. 173-78.  Charlton was directed to go to Syracuse for the referral concerning his orthopaedic issues.  T. 174-75.  Dr. Shah began treating Charlton in 2007 and saw him twice.  T. 208, 211.  One session was an initial visit and the other a referral for a specialist.  Id.  Therefore, the frequency, depth, and specialization of these relationships was not significant and, if an opinion had been rendered by either physician diminishes the weight which should be accorded their opinions as treating sources.  See, e.g., Hilton v. Apfel, No. 97-CV-1613 (SS), 1998 WL 241616, at *10 (S.D.N.Y. May 13, 1998) (holding that one-time consultative examinations are insufficient to overcome a treating physician relationship which has "spann[ed] several years [with individuals] who had extensive expertise in treating patients with [similar ailments].").

prove every fact through Step Four of the disability analysis which encompasses the current determination.  This is not a situation where the ALJ failed to discuss what evidence she relied upon, or where there was substantial evidence proffered by Charlton's treating physician which was ignored or discredited.  There were two opinions submitted which indicated both generally and specifically to what exertional limitations Charlton was subject.  T. 199-200, 202-07.  These opinions were substantially supported by objective medical evidence.  20 C.F.R. § 416.912(e); see also Hopper, 2008 WL 724228, at *11 (holding that when there is "little to no evidence in the record to determine [a plaintiff's] RFC properly, the ALJ should at least have attempted to contact [the plaintiff's] treating physicians . . . .").  No other assessments, generic or otherwise, were proffered by any other medical professional.  Thus, the treating physicians' opinions here were not rejected or uncredited.  Quite simply, such opinions were never offered.  The ALJ relied on what evidence was available, the only appropriate medical exertional assessment provided, and the objective medical evidence.  "If more information was needed from [the] treating and examining physicians . . . it was [Charlton's] burden to introduce that evidence."  Hall v. Astrue, No. 08-CV-2002, 2009 WL 426539, at *4 (E.D. Ark. Feb. 20, 2009).

Accordingly, the Commissioner's decision in this regard is affirmed.


### D.  Subjective Complaints of Pain

Charlton contends that the ALJ's decision to discredit his subjective complaints of pain was in error.

The ALJ determines whether an ailment is an impairment based on a two-part

24

test.  First, the ALJ must decide, based upon objective medical evidence, whether

"there [are] medical signs and laboratory findings which show . . . medical

impairment(s) which could reasonably be expected to produce [such] pain. . . ."

Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. §

404.1529 (2003).  This primary evaluation includes subjective complaints of pain.  20

C.F.R. § 404.1529 (2003).  "'Second, if the medical evidence alone establishes the

existence of such impairments, then the ALJ need only evaluate the intensity,

persistence, and limiting effects of a claimant's symptoms to determine the extent to

which it limits the claimant's capacity to work.'"  Barringer, 358 F. Supp. 2d at 81

(quoting Crouch v. Comm'r of Soc. Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003

WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

     An ALJ must consider all symptoms, including pain, and the extent to which

these symptoms are consistent with the medical and other evidence.  20 C.F.R. §

404.1529 (2003).  "Pain itself may be so great as to merit a conclusion of disability

where a medically ascertained impairment is found, even if the pain is not corroborated

by objective medical findings."  Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983)

(citing Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability

requires more than mere inability to work without pain."  Dumas v. Schweiker, 712 F.2d

1545, 1552 (2d Cir. 1983).  Pain is a subjective concept  "difficult to prove, yet equally

difficult to disprove" and courts should be reluctant to constrain the Commissioner's

ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  In

the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make

credibility findings."  Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v.

Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence.  Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that Charlton's allegations of disabling pain were not credible because (1) despite assertions of financial constraints, Charlton

continually rescheduled his knee surgery and refused to see any of the specialists to whom he was referred; (2) he did not seek regular and consistent medical attention for his various ailments; and (3) his activities of daily living were inconsistent with his complaints and indicative of an ability to complete at least light exertion employment. T. 18-19.  Moreover, the ALJ found that some of Charlton's claims were not supported by the medical evidence and that the most recent medical records showed no significant increases in the level and frequency of Charlton's complaints.  T. 19.  The ALJ credited Charlton's pain but found that the frequency, duration, and intensity did not appear to be what Charlton contended and no probative evidence indicated otherwise.  Id.

The bases for the ALJ's credibility determination were supported by substantial evidence.  First, Charlton testified that he was the primary homemaker, cleaning, cooking, washing dishes, grocery shopping, caring for the children, and assisting with mowing the lawn and shoveling snow.  T. 233-34, 241-42.  These physical capabilities are inconsistent with his complaints of pain and indicate an ability to perform activities requiring light exertion.

Second, Charlton's physical examinations with his primary care physicians and consultative physician have been relatively unremarkable with full strength and range of motion noted in all joints and no complaints of increasing or excessive pain or worsening of his general physical condition.  See, e.g., T. 17-18, 199-200.  These findings are also confirmed by the relatively benign radiology results and are consistent with Charlton's testimony that he was capable of performing a variety of housekeeping and child care chores.  Third, Charlton testified that he could lift and carry a fifty pound

27

bag periodically for ten to fifteen feet.  T. 240-41.

Fourth, while the precise number of surgical cancellations by Charlton is debated, at least nine months elapsed between surgery being proposed and completed despite at least three planned surgical dates (October 23, 2002, November 6, 2002, and early April 2003) and two documented cancellations by Charlton (October 23, 2002 and April 15, 2003).  T. 146, 148.  Financial difficulties preventing medical care afford no basis for adverse inferences against a claimant because in that instance the failure to obtain medical care was beyond the claimant's control.  Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Campbell v. Astrue, No. 07-CV-1551 (JCH), 2009 WL 279104, at *6 (D. Conn. Jan. 23, 2009) ("[A]n ALJ may not draw negative inferences from a claimant's lack of treatment without considering any explanations the claimant may provide.") (citations omitted).

However, the credibility of Charlton's claimed inability to afford co-payments and travel is controverted by the fact that he had approximately twelve medical appointments and four hospitalizations, some of which concerned pre-surgical consultations or assessments, in the nine months he continued to delay his surgery. Additionally, this case is distinguishable from Shaw because (1) Charlton failed to seek surgical intervention which was helpful, and (2) the failure to pursue surgery and orthopaedic referrals were only factors in the ALJ's decision not to accord full credence to Charlton's complaints of pain.  See Campbell, 2009 WL 279104, at *6 (distinguishing Shaw and holding that the ability to pay for medical treatment as a non-determinative factor is an appropriate ground for discrediting testimony) (citations omitted).  Additionally, "gaps in treatment, missed appointments, . . . and contrary

clinical and objective findings" may suffice for rejecting a plaintiff's credibility.  McGuire v. Astrue, No 07-CV-1626, 2009 WL 88590, at *5 (M.D.Fla. Jan. 13, 2009).

Therefore, based on Charlton's testimony, physical examinations, missed appointments, and generalized complaints, substantial evidence supports the ALJ's determinations.  The decision of the Commissioner on this ground is affirmed.

### E. RFC

Charlton contends that there exists insufficient evidence in the record to support the ALJ's findings regarding his RFC.  Charlton also contends that the ALJ should have received expert testimony from a vocational expert concerning his non-exertional limitations, particularly his high level of pain.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

Here, the ALJ found that Charlton retained the RFC to perform jobs where he could "lift or carry 50 pounds occasionally and 10 pounds frequently, stand and walk 2 hours in an 8-hour day and sit 8 hours in an 8-hour day with no crawling, crouching, or

climbing." T. 17.

The ALJ's findings are substantially supported by the record. First, the results of Dr. Peets' examination found that Charlton was limited in squatting due to ankle pain but that he had full range of motion and strength in his entire spine, could ambulate normally, and could climb on and off the table without assistance. T. 17, 199-200. Dr. Peets concluded that Charlton should limit his lifting and carrying to fifty pounds, he could walk four to five blocks, and Charlton should limit his prolonged sitting. T, 17, 199-200. These conclusions considered the volumes of medical records and Charlton's own testimony indicating that he was the primary caregiver for his two small children and homemaker for the family. T. 17. The conclusions of the only appropriate medical source who offered an opinion and the objective medical evidence echo the ALJ's findings. Although Dr. Peets was a non-treating physician, the regulations permit the ALJ to rely on the opinions of non-examining sources to override treating sources' opinions where supported by medical evidence in the record. See 20 C.F.R. § 404.1527(f); see also Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993). As discussed, the medical record lends ample support to Dr. Peets' conclusions.

Furthermore, to the extent that the treating physicians contributed to this functional analysis, their opinions are not materially different. Their examinations were unremarkable. The physicians did not pursue any additional treatment for any of Charlton's musculoskeletal ailments but only for his obesity. The findings from these physical examinations were supported by numerous benign radiology reports. This objective evidence does not controvert the conclusions of Dr. Peets but substantially supports the conclusions of both Dr. Peets and the ALJ.

30

The ALJ may apply the Grids or consult a vocational expert.  See Heckler v. Campbell, 461 U.S. 458, 462 (1983); Rosa v. Callahan,  168 F.3d 72, 78 (2d Cir. 1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003).  If the claimant's characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he or she is disabled.  Pratts v Chater, 94 F.3d 34, 38-39 (2d Cir. 1996).  Sedentary work requires

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally . . . no more than about two hours of an 8-hour workday, and . . . sitting . . . generally total[s] approximately 6 hours of an 8-hour workday.

SSR 83-10.  The RFC, which was properly determined for the reasons stated above, fits squarely within this criteria.[13]  Therefore, for the reasons stated above, the Commissioner's decision on this ground is assumed.

Charlton alleges that his RFC was improperly determined in light of his non-exertional impairments.  The Grids do not provide the exclusive framework for making a disability determination if a claimant suffers from non-exertional impairments that "significantly limit the range of work permitted by exertional limitations."  Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986) (citation omitted)).  Rather, the ALJ should elicit testimony from a vocational expert to determine if jobs exist in the economy that the claimant can still perform.  Id.  A vocational expert is not always

---

[13] Additionally, although given little weight, the RFC assessment provided by the Disability Administrator Klaeysen also falls within the definition of sedentary work.  T. 203-06.

mandated and the need for such testimony must be assessed on an individual basis after considering whether the non-exertional impairments are actually as limiting as alleged.  Id.  Specifically, Charlton claims that a vocational expert should have testified to address his non-exertional impairment of pain.

These contentions are without merit.  Pain is a symptom.  SSR 96-4p at *2; see also SSR 96-8p at *6 ("[S]ymptoms, including pain, are not intrinsically exertional or nonexertional.").  Thus, in and of itself, pain is not an impairment, but it "can cause limitations or restrictions that are classified as exertional, nonexertional or a combination of both."  SSR 96-4p at *2; see also SSR 96-8p at *6.  "It is the nature of the limitations or restrictions resulting from the symptom (i.e. exertional, nonexertional, or both) that will determine whether the [Grids apply] . . . ."  SSR 96-4p at *2.  Thus, Charlton is charged with proffering evidence concerning the exertional or non-exertional impairments which directly resulted from his symptoms of pain.  Evidence of such impairments from treating physicians, as previously discussed, were not offered.  Such a burden rests on Charlton.  See Hall v. Astrue, No. 08-CV-2002, 2009 WL 426539, at *4 (E.D. Ark. Feb. 20, 2009).  The limitation assessment which was provided and relied upon during the course of the litigation included only exertional limitations from Dr. Peets.[14]  This was substantially supported by the objective medical evidence and Charlton's own testimony.  Thus, the ALJ properly relied on the Grids because Charlton's abilities fell squarely within the definition of sedentary work.  As such, no vocational expert was required.

---

[14] See note 13 supra.

Thus, there is substantial evidence in the record to support the findings of the ALJ on these issues.  The Commissioner's determination in this regard is affirmed.


**VI. Conclusion**

For the reasons stated above, it is hereby

**ORDERED** that the Commissioner's decision denying disability benefits is **AFFIRMED**.


DATED: March 24, 2009
          Albany, New York

United States Magistrate Judge

33